UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW Z. RIVARD                    CASE NO. 2:17-cv-12665

        *Plaintiff*,                    DISTRICT JUDGE LAURIE J. MICHELSON
*v.*                                 MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 31, 32)

## I.    RECOMMENDATION

In light of the entire record in this case, I conclude that substantial evidence does not support the Commissioner's denial of benefits. Therefore, I recommend **GRANTING** Plaintiff's Motion, (Doc. 31), **DENYING** the Commissioner's Motion, (Doc. 32), and **REMANDING** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Introduction and Procedural History[1]

Plaintiff applied for Title XVI Supplemental Security Income (SSI) on January 21, 2016, alleging he became disabled on February 1, 2006. (R. 19, PageID.162.)[2] The

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income. (R. 2.)

[2] An application for Title II Disability Insurance Benefits also appears in the record. (R. 19, PageID.158.) The initial denial form, however, does not show he applied under that Title, (R. 19, PageID.106), the ALJ's decision mentions only Title XVI, (R. 19, PageID.53), and Plaintiff's brief does not address Title II.

Commissioner denied the claims. (R. 19, PageID.106.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on January 5, 2017. (R. 19, PageID.498-523.)[3] The ALJ issued a decision on February 25, 2017, finding Plaintiff was not disabled during the relevant period. (R. 19, PageID.53-63.) On June 16, 2017, the Appeals Council denied review. (R. 19, PageID.43-45.)

Plaintiff sought judicial review on August 14, 2017. (R. 1). She then filed the instant Motion for Summary Judgment on May 27, 2018, (R. 31), and the Commissioner countered with its own Motion a month later, (R. 32), and the case is now ready for resolution.

### B.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the

---

[3] The first administrative record filed by the Commissioner was missing a few pages of the hearing transcript. (R. 19, PageID.68-89; R. 31, PageID.532.) The Commissioner filed an addendum containing the complete transcript on June 11, 2018. (R. 28.) This Report and Recommendation uses the full transcript.

> duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other

3

jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### C.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 19, PageID.53-63.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since applying for benefits. (R. 19, PageID.55.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: osteoarthritis, status post ventriculoperitoneal shunt placements, degenerative disc disease of the lumbar and thoracic spine, spondylosis and stenosis of the cervical spine, depressive disorder, mild brain atrophic changes, and borderline intellectual functioning. (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (R. 19, PageID.55-58.) Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> medium work as defined in 20 CFR 416.967(c) except he can occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds frequently [*sic*]. He can stand or walk for 6 hours. He can sit for 6 hours. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He can occasionally kneel and crawl. He can frequently balance, stoop, and crouch. He can frequently reach, handle, and finger. He can frequently turn his neck side to side or move it up and down throughout the workday. He can never perform commercial driving or work around hazards such as unprotected heights or unguarded uncovered moving machinery. He can carry out simple instructions. He can tolerate routine changes in the workplace. He can never work at a production pace that requires hourly quotas. He can never interact with the general public. He can occasionally interact with supervisors and coworkers.

4

(R. 19, PageID.58.) At step four, the ALJ found that Plaintiff had no past relevant work. (R. 19, PageID.61.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (R. 11, PageID.62.)

### D.    Administrative Record

#### 1.    Medical Evidence

The earliest file in the record is Plaintiff's high school report card from the late 1980s. (R. 19, PageID.297.) It demonstrates that Plaintiff enrolled in many special education classes. (*Id.*)

The medical record begins on February 11, 2014, with a trip to the emergency room due to "a longstanding seizure disorder." (R. 19, PageID.230, 245, 265.) Medication for the disorder was often too expensive for Plaintiff, the notes state. (R. 19, PageID.230, 265.) But he needed it to prevent "further brain damage," Dr. E.M. Field concluded. (*Id.*) On examination, his musculoskeletal system was normal, as were the psychiatric findings. (R. 19, PageID.244.) A CT head scan showed "stable" brain appearance, with previously placed shunts also appearing stable. (R. 19, PageID.249.)

At the hospital again the next day, Plaintiff did not claim weakness and had "[n]o history of real complaints of back pain, neck pain or difficulty walking." (R. 19, PageID.267.) He was properly oriented and spoke fluently, though his grooming was "poor" and he had "some tangential thoughts." (*Id.*) The notes mention that Plaintiff struggled to complete the paperwork. (*Id.*) His neurological examination was normal—he had, for example, regular strength and gait—and his extremities were fine. (R. 19,

PageID.267-268.) No neck abnormalities were flagged. (R. 19, PageID.268.) Results of CT scans of his chest were normal. (R. 19, PageID.286.) The diagnosis was partial complex seizures caused by noncompliance with his medication. (*Id.*) The examining physician, Dr. Barbara A. Jahnke, also included in the notes her conclusion that Plaintiff was disabled. (R. 19, PageID.268-269.)

In April 2014, seizures once again sent him back to the emergency room. (R. 19, PageID.253.) Shortly before, he had run out of his medication. (*Id.*) On inspection, his neck was normal. (R. 19, PageID.254.) The following day he returned, complaining of a painful mass on his neck where a VP-shunt had been placed to treat his hydrocephalus,[4] (R. 19, PageID.255, 257), which he had as a child along with meningitis. (R. 19, PageID.270.) On inspection, his extremities were non-tender and had full range of motion, his joints were normal, he was properly oriented, his motor skills were normal, and his psychiatric and neurological examinations were normal. (R. 19, PageID.256, 273, 276.) He denied neck pain. (R. 19, PageID.275.) The notes also mention a history of osteoarthritis. (R. 19, PageID.272-273.)

He went to St. Mary's the next day for examination of the neck mass. (R. 19, PageID.257.) He denied headache, weakness, and musculoskeletal neck pain, among other possible symptoms. (R. 19, PageID.257-258.) The examination was largely normal: there was "a small area of fullness" on his neck, but it was non-tender; his neck had no

---

[4] The "primary characteristic" of hydrocephalus is "excessive accumulation of fluid in the brain." Nat'l Inst. Neuro. Disorders & Stroke, *Hydrocephalus Fact Sheet* (July 16, 2018), *available at* https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Hydrocephalus-Fact-Sheet (last accessed Dec. 31, 2018). The shunts removed Plaintiff's excess fluids. (R. 19, PageID.308.)

meningismus or adenopathy; his extremities had full range of motion; and he had normal motor function. (R. 19, PageID.259.) A CT scan of his neck uncovered no mass, but it did reveal "[m]ild to moderate cervical spondylosis" with changes "post anterior intervertebral fusions C4-C6." (R. 19, PageID.262, 291-292.) Another imaging study showed moderate calvarial asymmetry and mild atrophic brain changes, but the shunts were in place and "[n]o discernable acute infarct, intracranial hemorrhage or space occupying mass lesion" was observed. (R. 19, PageID.261, 290.) The discharge notes state that the studies were "unremarkable." (*Id.*)

The next medical record is from Plaintiff's January 26, 2016 visit to the emergency room complaining of a headache. (R. 19, PageID.337.) He reported that friends thought his gait was unsteady. (*Id.*) He had not been taking any medications. (*Id.*) There was no numbness, except in his wrists.[5] (R. 19, PageID.338.) His musculoskeletal examination, including his extremities, returned normal results, as did his neurological and psychiatric examinations. (R. 19, PageID.339.) CT scans and lab studies were unremarkable, but Plaintiff continued to complain of pain. (R. 19, PageID.343.) The end notes conclude that alcohol appeared to have caused his symptoms. (*Id.*)

An MRI on April 7, 2016, showed moderate degenerative changes to the cervical spine. (R. 19, PageID.362.) On May 4, 2016, Plaintiff went to the emergency room with neck pain, which had been increasing over the past few months. (R. 19, PageID.328.)

---

[5] The "review of systems" portion of the notes states that there was no neck pain, and neck issues were not mentioned in the "history of the present illness" section, which focused on headaches. (R. 19, PageID.336-338.) The initial vital signs, however, mentions pain in the head and neck. (R. 19, PageID.336.)

Recent physical therapy sessions had not helped, and he had not been able to undergo an ordered x-ray because he lacked insurance. (*Id.*) His hands were weak and he often dropped objects. (*Id.*) The pain would start in fingers and creep up his arms to his neck. (*Id.*) The seizures continued too. (*Id.*) He did not have back pain, however. (R. 19, PageID.329.) His examination was largely normal, although his neck had limited range of motion and his arms were weak; the notes stated that he made "poor effort during [the] exam." (R. 19, PageID.330.) Plaintiff was noted to be "noncompliant." (R. 19, PageID.332-333.)

A few days later, Plaintiff began physical therapy. (R. 19, PageID.432.) Increasingly, his arms and hands ached and felt numb, which made it difficult to use wrenches and to crochet, two activities he enjoyed. (*Id.*) The therapist observed Plaintiff's poor posture, concluding that it limited his arms' strength and range of motion. (*Id.*) Likewise, Plaintiff had "significant cervical weakness" and his trapezoids were excessively tense. (*Id.*)[6]

At a latter session, Plaintiff experienced spasms and had difficult holding tubing. (R. 19, PageID.439.) After a few sessions, he was discharged. (R. 19, PageID.430.) The therapist's final report states Plaintiff complained that all exercises increased the pain, constantly grabbed his neck and complained of arm and hand numbness, and struggled to grip exercise bands. (*Id.*)

Later in May 2016, Plaintiff was examined by Dr. R. Scott Lazzara as part of his application for disability benefits. (R. 19, PageID.303.) Plaintiff's main complaints were

---

[6] The notes use the term "hypertonic," which means excessive tension. 3 Schmidt, *Attorneys' Dictionary of Medicine* (2013).

"[s]pinal meningitis, shunt, drops things, numbness in hands and arms, painful arms, neck fusion, seizures and poor vision." (*Id.*) His seizures were ongoing. (*Id.*) He was not being treated for them currently. (*Id.*) Fifteen years prior, he had had cervical spine fusion surgery, leaving his arms numb and tingling. (*Id.*) He took over-the-counter medications for the pain; physical therapy was recommended, but he had not started it. (*Id.*) His condition made it increasingly difficult to crochet, fish, and hunt, but he still tried to do those activities for shorter periods. (*Id.*) Walking, sitting, and standing were not a problem, and he could lift 50 pounds. (*Id.*)

Dr. Lazzara's physical examination notes state that Plaintiff's memory was intact, he cooperated in following commands, and had appropriate insight and judgment. (R. 19, PageID.304.) The neck was "supple without masses." (*Id.*) Regarding his musculoskeletal system, there was "no evidence of joint laxity, crepitance, or effusion"; there was cervical spine straightening; both hands had decreased grip strength and mild loss of finger dexterity; his coordination and pincher grasp were normal; he "could tie, button clothing and open a door"; he had no trouble getting on and off the examination table; he had mild difficulty walking on his toes and heels, and mild difficulty standing one legged for three seconds." (R. 19, PageID.305.) He had normal range of motion in his dorsolumbar spine, shoulders, elbows, hips, knees, ankles, wrists, and hands, and decreased range in his cervical spine. (R. 19, PageID.305-307.) Neurological examination results were also normal, including intact cranial nerves and motor strength, normal gait and muscle tone; he had "subjective sensory loss in the hands and upper extremities." (R. 19, PageID.307.) He was currently able to do all the various physical activities listed on the form, including

sitting, standing, bending, stooping, carrying, buttoning clothes, dressing/undressing, dialing a telephone, picking up coins and pencils, and climbing stairs. (R. 19, PageID.301.) His reflexes were normal, as was his gait. (R. 19, PageID.302.)

Overall, Dr. Lazzara noted that, regarding the meningitis and seizures, Plaintiff did "not have any focal neurological deficits today related to the seizures." (*Id.*) Anti-seizure medications were recommended. (*Id.*) As for the cervical spine, Plaintiff had "diminished range of motion but there are no radicular symptoms." (*Id.*) His sensory loss was subjective; he had "some degeneration to his hands and wrists" with "an element of chronic tendinopathy as well as osteoarthritic disease in his hands"; but he "continue[d] to be able to do manipulative tasks"; and his legs were stable. (*Id.*) Further decline could be staved off by using anti-inflammatories and avoiding "repetitive work." (*Id.*)

Plaintiff again attempted physical therapy in June 2016. (R. 19, PageID.406.) He reported to the therapist, Kimberly Bishop, that his neck cracked, his arms hurt and were stiff, and his hands "don't work most of the time." (R. 19, PageID.403.) Consequently, he struggled to crochet, ride a bike, sit up straight, keep his head upright, ride in cars, and sleep. (*Id.*) On examination, he had "a significant flexed head and rounded shoulders posture" when seated. (*Id.*) His cervical range of motion was "moderately to significantly decreased into extension and bilateral rotation with no functional rotation noted with sidebending bilaterally." (*Id.*) He was also weak, but Bishop observed he made poor effort during the tests. (R. 19, PageID.403, 411.) "Abnormal illness behaviors are demonstrated throughout," she added. (R. 19, PageID.403.) When he failed to show for the next two sessions, the therapist discharged him. (R. 19, PageID.407.)

10

In July 2016, Plaintiff had a psychiatric examination with Dr. Nathalie Menendes for the disability application. (R. 19, PageID.308.) Plaintiff recounted his experience in special education classes and his history of arrests for DUIs and driving on a suspended license. (R. 19, PageID.309.) Currently, Plaintiff was homeless, had no friends, and did not belong to any groups. (*Id.*) Usually, he fished for food and searched for shelter. (*Id.*) Physically, his gait and posture were normal, but he complained of neck and hand pain, often rubbing them during the session. (*Id.*) Motor activity was normal, as was his contact with reality and his orientation. (R. 19, PageID.309-310.) His "thoughts were spontaneous, logical and organized," but his speech was muffled and hard to understand at times. (R. 19, PageID.309.) Throughout testing, Plaintiff cooperated and maintained attention. (R. 19, PageID.311.) Overall intellectual functioning was "in the extremely low range," his verbal and nonverbal skills and his memory were in the borderline range," his word knowledge and factual information were poor, and his conceptual thinking was below average. (*Id.*) Dr. Menendes diagnosed borderline intellectual functioning and unspecified depressive disorder and concluded as follows:

> Based on today's evaluation, the claimant is able to understand and remember simple and one step instructions and work procedures. He will likely have difficulty understanding and remembering complex and multi-step instructions and work. He will have problems concentrating and persisting through a typical 8 hour day. He should be able to maintain appropriate behavior and maintain adequate levels of hygiene and grooming if he has facilities to do so. He should be able to adjust to changes in his routine and environment.
> (*Id.*)

He could not, however, manage any benefit funds he received. (*Id.*)[7]

Dr. Bruce G. Douglass, Ph.D., reviewed the records for the Commissioner in July 2016. (R. 19, PageID.101-103.) He concluded that Plaintiff had no significant limitation in the following abilities: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; working with and near others without distraction; making simple work-related decisions; asking simple questions or requesting assistance; and getting along with coworkers without distraction. (*Id.*) Plaintiff had moderate limitations in the following: understanding and remembering detailed limitations; carrying out very simple and short instructions; performing within a schedule; completing a workday without interruption from his psychological symptoms (but he could do jobs without strict production deadlines and demands); accepting instruction and criticism from supervisors; maintaining socially appropriate behavior and cleanliness (but he would "work best alone or in small, familiar groups"). (*Id.*) The only marked limitation was carrying out detailed instructions. (*Id.*) Overall, Dr. Douglass concluded that "the evidence suggests that the claimant can do unskilled work on a sustained basis." (R. 19, PageID.103.)

---

[7] Based on Dr. Menendes's tests, Plaintiff argues that the "record establishes that Plaintiff suffers from mental retardation, not borderline intellectual functioning." (R. 31, PageID.538.) The report, however, never states "mental retardation" but instead says that Plaintiff's overall functioning was "in the extremely low range," while his more specific functions were borderline or below average. (R. 19, PageID.311.) Plaintiff also contends that the ALJ erred during the hearing by minimizing his intellectual functioning as "borderline," (R. 28, PageID.515), because Dr. Menendes's testing revealed a lesser level of functioning. (R. 31, PageID.538.) Again, however, Plaintiff is mistaken. While Dr. Menendes characterized his "overall intellectual functioning" as in the "extremely low range," her diagnosis was "Borderline Intellectual Functioning." (R. 19, PageID.311.) It is unclear what, if any, difference exists between these two levels, but the important point is that the ALJ had support for his statement.

In September 2016, Plaintiff was riding his bicycle when a truck hit him. (R. 19, PageID.319.) At the hospital, he noted his hand and neck pain had been chronic, with the hand growing worse since the accident. (R. 19, PageID.319-320.) Associated symptoms were back pain, headache, joint pain, and memory loss. (R. 19, PageID.320.) On examination, his neck and back were nontender, and his musculoskeletal examination was normal. (R. 19, PageID.321.) His hand had some swelling at the left thenar, mild tenderness, clubbing, and a "few superficial small abrasions." (R. 19, PageID.322.) His bilateral handgrip was four out of five, with altered light touch. (*Id.*) Otherwise, his examination was normal. (R. 19, PageID.321-322.) A CT scan of the cervical spine did not reveal injury; but he did "appear[] to have an L2 compression fracture of the superior endplate." (R. 19, PageID.322.) Mild degenerative changes in the thoracic spine were also observed. (R. 19, PageID.380.) X-rays of his hands showed no acute injury, just soft tissue swelling and "evidence of new bone formation." (*Id.*) The results were later characterized in the notes as "normal." (R. 19, PageID.316.)

A few weeks later, he returned to the emergency room complaining of continuing hand pain. (R. 19, PageID.313-314.) He had run out of Tylenol with codeine, which he had been taking for the pain. (R. 19, PageID.314.) But he denied weakness and back and neck pain. (*Id.*) At the examination he was alert and properly oriented. (R. 19, PageID.316.) His extremities were normal: there was no tenderness, swelling, abrasions, or deformity, and he had full range of motion with his wrists and fingers, normal gait, normal sense, and normal motor functioning. (*Id.*)

Plaintiff was scheduled for an MRI regarding the lumbar spine and prescribed a brace. (R. 19, PageID.322.) The MRI, completed a few days later, verified the L2 fracture, and also mild-to-moderate degeneration, but the recommendation was for "conservative management." (R. 19, PageID.386.) On September 30, Plaintiff underwent a kyphoplasty to fill the fracture at L2. (R. 19, PageID.387-388.) After the procedure, an MRI showed that the other verterba had "more normal height and alignment." (R. 19, PageID.389.) The results remained the same at an MRI roughly a month later. (R. 19, PageID.390.)

### 2. Adult Function Form

Plaintiff completed an adult function form in March 2016. (R. 19, PageID.194-201.) He wrote that he had no feeling in his hands, could not read or spell well, had trouble sleeping, and got headaches.[8] (R. 19, PageID.194.) On a typical day, he did not do much, and while he tried to help others he often had difficulty understanding matters. (R. 19, PageID.195.) He had no problems with personal care. (*Id.*) Remembering to take medicine was not a problem, but he had difficulty remembering certain things. (R. 19, PageID.196.) He could prepare easy meals, like sandwiches, soup, and hotdogs. (*Id.*) But cooking could take a while due to his hand problems. (*Id.*) As for household chores, he noted that cleaners gave him headaches and his hands were numb, and so he did them as little as possible. (*Id.*) He was homeless and had no yardwork to complete. (R. 19, PageID.197.) He could shop and go out alone, and he usually walked; he lacked a license because he owed money to the State. (*Id.*) The function form asked four questions regarding his ability to handle

---

[8] The writing on the form is often difficult to decipher, bearing out Plaintiff's struggles with writing.

money; he answered only one, stating he could count change, and he noted again that he could not spell or read well. (*Id.*)

His hobbies included crocheting, watching television, fishing, and reading. (R. 19, PageID.198.) His social activity was talking on the phone, but not often. (*Id.*) He did not have problems getting along with others, including authority figures, and he had never been fired for failing to properly interact with others. (R. 19, PageID.199.) The function form then lists various abilities and asks which are affected by the claimant's conditions. (R. 19, PageID.199.) These include, among others, lifting, squatting, bending, reaching, understanding, walking, and sitting; the only ones Plaintiff had problems with, he wrote, were seeing, using his hands, and "memory." (*Id.*) His attention span and ability to follow spoken instructions were "good sometimes," although he had trouble with written instructions. (*Id.*) He needed glasses, but no other assistive devices. (R. 19, PageID.200.)

### 3.   Administrative Hearing

Plaintiff was unrepresented at the hearing. (R. 28, PageID.500.) Before questioning, the ALJ informed Plaintiff that he had the right to representation. (*Id.*) Continuing, the ALJ stated, "If you wish to exercise that right, I will postpone this hearing and reschedule it for another date, but the choice is yours and yours alone to make." (R. 28, PageID.500.) The ALJ then confirmed that Plaintiff had signed a waiver of representation and wished to go forward without counsel. (R. 28, PageID.501.) "And you feel comfortable representing yourself," the ALJ asked. (*Id.*) "Yes," Plaintiff responded. (*Id.*)

At the start of questioning, Plaintiff and the ALJ had the following exchange:

[ALJ] Q: And do we have everything we need? In other words, there's no outstanding evidence?

[Plaintiff] A: Yeah, actually I have to go in and have surgery done on my neck, two surgeries this year. . . .

A: I'm waiting for the one to come up soon as the insurance approves it, because when I got hit here this last summer on the bike, it destroyed my neck and they got to go in an re[-]fuse it.

Q: So, you're up for surgery?

A: Yeah.

Q: When – for two surgeries?

A: Yeah, two.

Q: So when's your first one scheduled?

A: It's – I'm just waiting on the approval for the insurance to –

Q: Okay. Well, we're going to wait on those records because there's no date on them, so I have no idea when they're going to occur. We'll just use your testimony that you have two surgeries and we move on –

A: Yes.

Q: – from that. What I meant was you have any evidence that already exists that we don't have?

A: Not that I'm aware of.

(R. 28, PageID.502.)

Plaintiff then testified that his schooling ended after the ninth grade. (R. 28, PageID.505.) Currently, he lived alone. (*Id.*) His hands and neck were the worst of his conditions, limiting him the most. (*Id.*) The doctor believed that the hand problems resulted from his neck issues. (R. 28, PageID.505-506.) The bones in his neck were deteriorating,

16

Plaintiff stated. (R. 28, PageID.506.) The surgeries would fuse the bones, straightening his neck and relieving the pain. (*Id.*) The ALJ then asked,

> Q: Okay. What kind of treatment are you getting for your neck pain?
>
> A: Treatment? Nothing right now. I did go through therapy though here.
>
> Q: No treatment for your neck pain? You have two surgeries planned and you have no treatment for your neck pain . . . .
>
> A: I will go probably after the surgeries what they're going to do.
>
> Q: After the surgery?
>
> A: Yeah. Therapy, I guess.
>
> Q: I don't understand why – I really don't understand why you have two surgeries planned and you have no treatments right now. Your doctor says you don't need any treatment, but you have two surgeries. It's bad enough for surgery?
>
> A: Well, they got to do the surgery and then I says it'll get recovery time . . . .
>
> Q: But right now you have no treatment? No pain medications, nothing for your neck pain right now?
>
> A: They – all they described [sic] is something over the counter.
>
> Q: Over-the-counter medication?
>
> A: Yeah.
>
> Q: All right. How about your hand pain? What are you getting for your hand pain? Any treatment for that?
>
> A: No.

(R. 28, PageID.506-507.)

Regarding his hands, he could not keep his grip because he lacked strength. (R. 28, PageID.507-508.) The most he could lift was 10 to 15 pounds. (R. 28, PageID.508.) Wrenches and books were too heavy to lift, and he could no longer crochet. (R. 28, PageID.508, 510.) He could, however, wash clothes, clean dishes, shower, button clothes, and pick up coins. (R. 28, PageID.509-510.) His neck prevented him from laying down and sitting up. (R. 28, PageID.511.) The pain was constant. (*Id.*)

Other problems included difficulty reading and brain shunts that were placed due to spinal meningitis. (R. 28, PageID.511-512.) The shunts were implanted at birth and periodically replaced. (R. 28, PageID.512.) They might malfunction in the future, but currently they functioned properly and did not cause problems. (R. 28, PageID.512-513.) As for seizures, his last one was four or five months before the hearing. (R. 28, PageID.513.) Over the last year he had three or four seizures, despite failing to take his medicine. (R. 28, PageID.513-514.) Plaintiff also testified he was depressed "[t]o a degree, I think." (R. 28, PageID.515.) He noticed that he became irritated quickly and doubted he could work with people daily. (R. 28, PageID.515-516.) But he had not received treatment or medication for the depression. (R. 28, PageID.515.) Headaches occurred once or twice a month, and he had not sought treatment for them. (R. 28, PageID.516-517.)

Turning to the VE, the ALJ stated that Plaintiff lacked past relevant work. (R. 28, PageID.519.) Then the ALJ posed his first hypothetical:

> This person can occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand or walk for six hours; sit for six hours. The person can never climb ladders, ropes or scaffolds. The person can occasionally climb stairs and ramps, kneel and crawl. The person can frequently balance, stoop and crouch. The person can frequently reach, handle and finger. The

person can frequently turn his neck side to side or move it up and down throughout the workday. The person can never perform commercial driving or work around hazards such as unprotected heights or unguarded uncovered moving machinery. The person can carry out simple instructions. The person can tolerate routine changes in the workplace. The person can never work at a production rate pace that requires hourly quotas. The person can never interact with the general public. The person can occasionally interact with supervisors and coworkers.

(R. 28, PageID.519-520.) The VE testified Plaintiff could work as a counter-supply worker (131,000 positions nationally), a cleaner of laboratory equipment (688,000 positions nationally), and food-service worker (41,000 positions nationally). (R. 28, PageID.520-521.) If the person above was off task 20 percent or missed two days of work each week, he could not find employment. (R. 28, PageID.521.)

## F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[9] carve the evidence into various

---

[9] Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4

categories, "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. §§ 404.1527(c) , 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship

---

n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons,

supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[10] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ

---

[10] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. §§ 404.1529(c), 416.929(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also

23

relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.    Arguments and Analysis

#### 1.    The ALJ's Failure to Develop the Record

##### a.    Parties' Arguments

Plaintiff first alleges that the ALJ violated 20 C.F.R. § 416.912(c) by failing to develop the medical record. (R. 31, PageID.540.) In particular, Plaintiff testified at the hearing that two surgeries were planned for his neck. (R. 31, PageID.535.) The transcript shows the ALJ as stating, "Okay, Well we're going to wait on those records because there's no date on them, so I have no idea when they're going to occur. We'll just use your testimony that you have two surgeries and we move on." (R. 28, PageID.502.) But this must have been a mis-transcription, Plaintiff contends, because the ALJ did not wait for the records. (R. 31, PageID.535-536.)

Further, Plaintiff testified at the hearing that he was not receiving current "treatment" for his neck. (R. 31, PageID.536.) But Plaintiff now contends that he misunderstood the ALJ's question about "treatment" as meaning "therapy." (*Id.*) In fact, he did have current medical records, including imaging studies, completed before the hearing. (*Id.*) Those never made it into the record—Plaintiff attaches them to his brief. (R. 31, PageID.536, 545-559.)

According to Plaintiff, his testimony at the hearing—where he was unrepresented—was clearly affected by his cognitive limitations. (R. 31, PageID.537.) The record shows that he has mental retardation, Plaintiff argues. (R. 31, PageID.538.) But the ALJ did not

24

ask whether he understood the proceedings or fully comprehended his right to representation, which he was advised of and waived. (R. 31, PageID.537.) Nor could he advise the ALJ of the recent test results. (R. 31, PageID.538.) The ALJ apparently believed he was not receiving medical treatment even though recent emergency room records and physical therapy reports were in the record. (R. 31, PageID.539.) Further, Plaintiff has now obtained records from his cervical spine surgery, which occurred in the month following the ALJ's decision. (R. 31, PageID.540.) Plaintiff thus argues that the ALJ erred by failing to obtain the records. (R. 31, PageID.539-540.)

Defendant counters that even if Plaintiff's waiver of the right to representation was not knowing, he still must demonstrate prejudice. (R. 32, PageID.565.) Thus the argument turns on whether the new imaging and surgery records would have changed the outcome. (R. 32, PageID.566.) The imaging results were available before the hearing, but the surgery record was not. Defendant therefore questions how the ALJ could have been obligated to obtain the surgery record. (*Id.*) Regarding the imaging studies, Defendant argues that the ALJ could not have reasonably known enough to seek them because Plaintiff told him at the hearing that no evidence was missing from the record and he was not receiving any treatment. (*Id.*)

In any event, Defendant concludes that the imaging records cannot show functional limitations and thus could not prove a more limited RFC. (R. 32, PageID.567.) Further, the studies "are not treatment *per se*," but rather diagnostic tests. (*Id.*) As such, the ALJ's assumption that Plaintiff was not receiving treatment was accurate. (*Id.*)

25

Nor can the surgery save Plaintiff's case, Defendant argues, as it too fails to translate into specific functional limitations. (R. 32, PageID.567.) No doctor has concluded that Plaintiff has limitations greater than those in the RFC. (*Id.*) Even so, the ALJ knew of the upcoming surgery but opted to rely on Plaintiff's normal musculoskeletal examination results and his reported capabilities. (R. 32, PageID.568.) Defendant also points out that the treatment was conservative—consisting of pain medication and physical therapy over the course of the record leading to the ALJ's decision. (R. 32, PageID.568-569.)

### b.    Analysis

#### i.    Legal Background

The issue is whether the ALJ violated his duty to develop the record by failing to obtain Plaintiff's recent pre-hearing treatment records and post-hearing surgical report.[11] As noted above, the Plaintiff has the burden of proving his disability. 20 C.F.R. § 416.913(a) (2016). With this, comes the responsibility to submit a complete evidentiary record. *Id.*; *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th

---

[11] Defendant initially suggests that the main issue is whether Plaintiff knowingly and voluntarily waived his right to representation. (Doc. 32, PageID.565.) Plaintiff does emphasize his unrepresented status and mental limitations, and even states that he failed to understand his right to be represented. (R. 31, PageID.537-538.) But these stray sentences do not raise a waiver argument, and no law on waiver is cited. Instead, Plaintiff's references to waiver appear to advance his argument that the ALJ should have perceived the need to develop the record. Indeed, his Brief's table of contents captions the argument, "Violation of Twenty CFR §416.912(d)," a regulation involving development of the record. (R. 31, PageID.529.) Thus, the core issues involve the ALJ's development of the record, not the nature of Plaintiff's waiver.

Even assuming Plaintiff presents both issues, they would merge into the same analysis, as Defendant observes. (*Id.*). As explained in *Brown v. Comm'r of Soc. Sec.*, No. 12-cv-15108, 2013 WL 5785783, at *8 (E.D. Mich. Oct. 28, 2013), a plaintiff arguing an involuntary waiver must still show prejudice by, for example, the ALJ's failure to develop the record. Consequently, "the waiver issue is properly subsumed by the issue of whether the ALJ failed to fully develop the record and whether Plaintiff was prejudiced by any failure." *Id.*; *see also* 2 Samuels, 2 Soc. Sec. Disab. Claims Prac. & Proc. § 20:11 (2nd ed.) ("Failure to properly waive representation may not in, and of, itself be grounds for remand unless, in addition, there is a demonstration of prejudice from failure to have counsel.").

Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.").

Social Security proceedings, however, "are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality). As such, the ALJ is duty-bound to develop the record. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). The regulations charge the Commissioner with "develop[ing] your [*i.e.*, the claimant's] complete medical history for at least the 12 months preceding" the filing date. 20 C.F.R. § 416.912(d) (2016). The Commissioner makes "every reasonable effort" to help claimants obtain medical reports. *Id.*

This duty heightens "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-1052). Under those special circumstances, the ALJ must "'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Lashley*, 708 F.2d at 1051 (citation omitted). Additionally, the ALJ should "be 'especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.'" *Id.* (citation omitted). These responsibilities are even more critical when, in addition to meeting the three conditions above, the claimant has mental impairments. *See Thrasher v. Comm'r of Soc. Sec.*, No. 1:12-cv-151, 2013 WL 486123, at *3 (S.D. Ohio Feb. 6, 2013), *Rep. & Rec. adopted by* 2013 WL 791882 (S.D. Ohio Mar. 4, 2013); *Burrows v. Comm'r*

*of Soc. Sec.*, No. 12-cv-10109, 2012 WL 5411113, at *9 (E.D. Mich. Sept. 28, 2012), *Rep. & Rec. adopted by* 2012 WL 5413174 (E.D. Mich. Nov. 6, 2012).

No brightline rules guide a court's review of an ALJ in this context; whether the ALJ met the heightened duty must be decided on a case-by-case basis. *Osburn v. Apfel*, 182 F.3d 918, 1999 WL 503528, at *7 (6th Cir. 1999) (unpublished); *Lashley*, 708 F.2d at 1052. Still, evidence of the ALJ's failure to develop the record often takes similar forms, including "superficial or perfunctory questioning, as well as a failure to obtain all available medical records and documentation." *Vaca v. Comm'r of Soc. Sec.*, No. 1:08-cv-653, 2010 WL 821656, at *6 (W.D. Mich. Mar. 4, 2010).

If the ALJ's failure to develop the record results in evidentiary gaps, the court must determine whether those gaps prejudiced the claimant. *Nealy v. Comm'r of Soc. Sec.*, No. 15-cv-10414, 2016 WL 922949, at *2 (E.D. Mich. Mar. 10, 2016) ("'In determining whether it is necessary to remand for a clarification of the record, the court is guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" (citation omitted)); *Bott v. Colvin*, 16-10922, 2017 WL 2806822, at *9 (E.D. Mich. May 31, 2017) (same), *Rep. & Rec. adopted by* 2017 WL 2798563 (E.D. Mich. June 28, 2017). As the Seventh Circuit has held, a "'significant omission'" in evidence is needed before deciding that the ALJ failed to develop the record, and "an omission is significant only if it is prejudicial." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). A plaintiff shows prejudice by explaining why the facts the ALJ overlooked would have been relevant to the disability determination. *Brown v. Comm'r of Soc. Sec.*, No. 12-cv-15108, 2013 WL

5785783, at *8 (E.D. Mich. Oct. 28, 2013) (citing *Czibor v. Astrue*, No. 12 C 1678, 2012 WL 4361554 (N.D. Ill. Sept. 20, 2012)).

With these principles in mind, the Court's first task is to decide whether the ALJ had a special duty to develop the record. If so, the question becomes whether the ALJ breached that duty. If there was a breach, the final consideration is whether it prejudiced Plaintiff.

### ii.      Was there a Heightened Duty?

Turning to the initial question, the heightened duty springs to life when three conditions exist. *Wilson*, 280 F. App'x at 459. Plaintiff satisfies the first because he attended the hearing without a representative. Skipping ahead to the third, nothing suggests Plaintiff was familiar with the hearing procedures, although the ALJ explained the process as the hearing progressed and Plaintiff indicated he understood. (R. 28, PageID.500-501, 503-504.) But Plaintiff does not appear to have filed earlier claims or have had any assistance from friends or family at the hearing. *Cf. Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 345 (6th Cir. 2008) (noting that Plaintiff was represented by a paralegal and rejecting arguments that the ALJ failed to develop the record); *Baker v. Comm'r of Soc. Sec.*, No. 12-cv-14530, 2013 WL 6409955, at *6 (E.D. Mich. Dec. 9, 2013) (noting that the plaintiff had filed earlier claims while represented and holding that he was familiar with hearing procedures). For these reasons, I suggest that Plaintiff was unfamiliar with the hearing procedures.

The second requirement—that he be incapable of presenting an effective case—is a closer question. On one hand, the record establishes some cognitive difficulties. In school,

he was in special education classes and his schooling ended after the ninth grade. (R. 19, PageID.297.) Dr. Menendes's evaluation had Plaintiff's overall intelligence in the extremely low range. (R. 19, PageID.311.) His testimony about his problems with writing is substantiated by the poor spelling on his adult function form, and he also testified he struggled with reading. (R. 19, PageID.194-201; R. 28, PageID.511.) Further, he produced no medical opinion statements from his doctors; this indicates he might have been unable to assemble persuasive evidence. He also failed to flag for the ALJ then-recent imaging studies of his spine, which he now attaches to his brief. (R. 31, PageID.545-547.)

On the other hand, the record contains relatively little evidence of Plaintiff's intellectual functioning. The reports just mentioned cover the most significant pieces. Also, while Plaintiff had poor spelling, his answers on the function form were generally appropriate responses to the questions. (R. 19, PageID.194-201.) Likewise, his hearing testimony was responsive and generally articulate; he could have been more precise but his answers corresponded to the questions and did not drift into irrelevant matters, although sometimes they were incomplete or almost incoherent. *See Lashley*, 708 F.2d at 1052 (noting that the claimant's lack of "articulateness . . . imposed a special duty on the ALJ to be especially probing in his questioning").

I conclude that Plaintiff was unable to make an effective case. For one thing, Dr. Menendes's report establishes Plaintiff's low cognitive functioning; the evaluation is more significant because it reflects the only cognitive testing in the record. The ALJ's questioning on this point was superficial. (R. 28, PageID.515.) He stated that Plaintiff's intellectual functioning was "borderline" and he had "problems understanding," then asked

30

if he also had difficulties reading and writing. (*Id.*) After Plaintiff agreed he struggled with all three—"reading, writing and understanding things"—the ALJ shifted focus to depression. (*Id.*) Consequently, he never probed the limits of Plaintiff's "understanding," which Plaintiff left vague. That line of inquiry was critical to determining not only Plaintiff's mental capacity, but also whether he tracked the proceedings and gave accurate answers. If Plaintiff could not, then the ALJ should have been more alert for opportunities to develop the record, particularly by obtaining medical records that Plaintiff might have failed to submit.

Also, Plaintiff's and the ALJ's exchange over the surgeries was cursory. Plaintiff did not manage a full response when asked when the first surgery was, he merely stated, "It's – I'm just waiting on the approval for the insurance to –." (R. 28, PageID.502.) The ALJ then interjected with the potentially confusing conclusion that "we're going to wait on those records because there's no date on them, so I have no idea when they're going to occur." (*Id.*) From this, Plaintiff might have believed that the ALJ would wait for the records. Also, Plaintiff never said, or apparently had the chance to say, the surgeries were not scheduled, as the ALJ surmised. Relatedly, the ALJ did not tell Plaintiff that the record could remain open for the surgery reports. *Cf. Vaca*, 2010 WL 821656, at *10 (noting the ALJ's failure to inform the plaintiff of holding the record open). (Below, I will discuss the ALJ's failure to keep the record open.).

Other parts of the hearing also show Plaintiff's struggles to make his case. For example, Plaintiff first testified that his shunts did not cause any present problems but would need replacement "down the road," usually every seven or eight years. (R. 28,

PageID.512-513.) The testimony thus gave the impression that the shunts caused little difficulty. Just five months later, however, Plaintiff experienced hydrocephalus and underwent two procedures to remove, replace, and externalize the shunts. (R. 31, PageID.550-553.)

Likewise, Plaintiff did not recall the seizures related to the shunts and meningitis, which had caused hospitalizations in the past, as had headaches. (R. 19, PageID.230, 245, 253, 265-266, 328, 337.) Instead, the ALJ had to broach the seizure issue. (R. 28, PageID.513.) Once again, however, Plaintiff's responses demonstrate his difficulty presenting a case. Asked why he had not taken medication, he stated, "I have back in – to see him again on that." (R. 28, PageID.514.) He added, "And I haven't taken it in a long time. They used to give me –." (*Id.*) At that point, the ALJ interrupted. Thus, Plaintiff gave an incomplete and incoherent explanation for why he failed to take the medication.

Additionally, Plaintiff had no questions for the VE. The entire hearing ran a brisk 27 minutes. (R. 28, PageID.500, 523.) In short, then, Plaintiff was unable to participate meaningfully in the hearing.

### iii.     Did the ALJ Meet the Heightened Duty?

Next, did the ALJ fulfill his special duty to develop the record? Plaintiff's argument focuses on a few specific reports that the ALJ failed to incorporate into the record. One group of these reports originated prior to the hearing: an MRI of Plaintiff's cervical spine in November 2016, and another the following month. (R. 31, PageID.545-547.) The other relevant record is from Plaintiff's cervical-spine surgery in March 2017, about one month after the ALJ's decision denying benefits. (R. 31, PageID.554-557.)

32

Regarding the MRIs, Plaintiff argues that the ALJ knew enough that he should have pursued these records. (R. 31, PageID.539.) I agree. True, courts have not found authority for "demanding that the ALJ continue a search for records without any other indication of where to look." *Nealy*, 2016 WL 922949, at *3; *Vaca*, 2010 WL 821656, at *6 ("[T]he ALJ is not required, when confronted with an unrepresented claimant, to factually develop matters regarding which he has no notice."). Given Plaintiff's obvious struggles at the hearing, detailed above, the ALJ should have known that relevant records might exist. Commonsense indicated that Plaintiff's surgeries would not have been prescribed in a paperless vacuum. Yet the ALJ's questioning was insufficient to discover these records. He did not ask who ordered the surgery or even whether Plaintiff had been seeing a doctor; instead he summarily decided to "just use your testimony that you have two surgeries" and later questioned Plaintiff more generally about treatments rather than hospital visits (which would produce a paper trail). (R. 28, PageID.506-507.) The ALJ's statements almost drip with incredulity concerning the surgery. But further bolstering Plaintiff's credibility was his statement linking the surgery to his accident: "I'm waiting for the one to come up soon as the insurance approves it, because when I got hit here this last summer on the bike, it destroyed my neck and they got to go in and re[-]fuse it." (R. 28, PageID.502.) Plaintiff's having been recently struck by a truck, fracturing a verteba, provided the ALJ a strong clue that medical appointments might be ongoing.

That leaves the post-decision surgery records. Plaintiff put the ALJ on notice by testifying about the planned surgeries. (R. 28, PageID.502.) Defendant questions "how the ALJ could have procured the [surgery report]; certainly, plaintiff cannot show the ALJ

33

failed to develop the record based on evidence that did not exist." (R. 32, PageID.566.) That is not necessarily true.

Generally, claimants must submit all evidence "no later than 5 business days before" the hearing. 20 C.F.R. § 416.1435(a). After that deadline, the ALJ "will accept the evidence" under certain circumstances, such as when the agency's action misled the claimant, the claimant's limitations prevented them from submitting the evidence earlier, or unusual or unavoidable circumstances prevent submission. 20 C.F.R. § 416.1435(b). The Commissioner's internal guidance suggests that post-hearing evidence is subject to the regulation. The Hearings, Appeals, and Litigation Law Manual (HALLEX), states that "[w]hen a claimant or appointed representative misses the five-day deadline and requests additional time to submit evidence after the hearing, the ALJ generally will evaluate whether the circumstances in 20 CFR . . . 416.1435(b) apply using the procedures in HALLEX I-2-6-59." 1 HALLEX I-2-7-20 (last updated May 1, 2017).[12] The ALJ "will accept the evidence" if 20 C.F.R. § 416.1435 is satisfied. 1 HALLEX I-2-6-59 (last updated May 1, 2017).[13] It would seem that procedures scheduled for after a hearing might constitute an "unavoidable circumstance" justifying holding the record open.

Plaintiff did not request to submit post-hearing materials; instead, the issue is whether the ALJ was obligated to extend the evidence-gathering phase until after the surgery. Courts have held that the ALJ's duty to develop the record might entail a duty to

---

[12] Available at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-7-20.html.

[13] Available at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-59.html.

keep it open. *See Rivera v. Astrue*, No. 11-C-966, 2012 WL 3150322, at *2 (E.D. Wis. Aug. 1, 2012) ("In some cases, [the duty to develop the record] may require the ALJ only to hold the record open after the hearing to allow the claimant time to obtain records or reports."); *cf. Cooke v. Comm'r of Soc. Sec.*, No. 1:09CV0842, 2010 WL 5480745, at *2 (N.D. Ohio Sept. 30, 2010) (citing *Lashley* and noting, in a case where the plaintiff was represented, that "the ALJ's failure to keep the record open when he had been made aware that there was medical evidence that could be probative of the plaintiff's claim of disability violated his duty to fully and fairly develop the record"). Here, then, it should be determined whether the ALJ's special duty to develop the record required him to hold it open until Plaintiff's surgery reports were complete.

I conclude that the ALJ was obligated to delay his decision, if not for the surgery then at least for more information regarding it.[14] Plaintiff testified that the surgery was "soon," but the ALJ jumped to the conclusion that none had been scheduled. (R. 28, PageID.502.) Even so, the ALJ could have requested records about the surgery to see if it would occur soon. This approach would not have violated the Commissioner's internal guidance manual requiring ALJs to establish time limits for submitting evidence when they hold a record open. 1 HALLEX I-2-7-20(A). Consequently, I suggest that the ALJ's duty to develop the record obligated him to leave it open long enough to learn more about the surgery.

---

[14] Although the transcript has the ALJ stating "we're going to wait on those records," it was apparently either a misstatement or a mistranscription. (R. 28, PageID.502.) This is clear from what followed, as he stated he had "no idea when they're going to occur" and that he would "just use your testimony that you have two surgeries." (*Id.*)

Additionally, the ALJ's inadequate performance is demonstrated by his questions on Plaintiff's medications. The ALJ asked why Plaintiff was not taking seizure medication. (R. 28, PageID.514.) But as noted above Plaintiff's response was unilluminating and difficult to parse. Instead of pursuing the matter further, the ALJ told Plaintiff he should get treatment. (*Id.*)

> ALJs, however, are prohibited from
>
> draw[ing] any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual.

SSR 97-6p, 1996 WL 374186, at *7 (July 2, 1996). One such explanation is that the claimant cannot afford the treatment or access free or low-cost services. *Id.* at *8; *see also Hudson-Kane v. Berryhill*, 247 F. Supp. 3d 908, 918-919 (M.D. Tenn. 2017) (finding the ALJ's rejection of a medical opinion due to the plaintiff's noncompliance with a treatment plan was unreasonable where the plaintiff could not afford the treatment). This is true even when the treatment might remedy the impairment and remove the disability. *See McKnight v. Sullivan*, 972 F.2d 241, 242 (6th Cir. 1990); 3 Soc. Sec. Law & Prac. § 38:14 (2018). Plaintiff was homeless (R. 19, PageID.59), and had reported to a medical provider that the medication was too expensive, (R. 19, PageID.230, 265.) Consequently, the ALJ should have considered whether Plaintiff could afford the seizure medications.

Perhaps this cursory questioning explains why, in his subsequent opinion, the ALJ gave the seizures short shrift. The decision's discussion cites one episode where Plaintiff

denied recent seizures and then cites an entire exhibit (containing 36 pages) for the propositions that Plaintiff consistently took his medication and "has denied seizure upon presentation for treatment." (R. 19, PageID.59 (citing Exhibit 4F, p. 1, and 4F).) This entirely ignores Plaintiff's emergency room visits due to seizures, as well as his statements at the hearing and in the record that he had run out of medication or could not afford it. (R. 19, PageID.230, 253, 265; R. 28, PageID.514.)

For these reasons, I find the ALJ failed to discharge his special duty to conscientiously develop the record.

### iv.     Was Plaintiff Prejudiced?

Finally, Plaintiff must also demonstrate prejudice. This question turns on the relevancy and impact of the new records.[15] The first record is a cervical spine MRI from November 9, 2016. (R. 31, PageID.545-546.) Its relevant findings were as follows: the vertebrae from C4 to C6 were without fracture and "solid[ ]appearing" after fusion; "moderate diffuse narrowing of the cervical canal" from C2-C3 to C6-C7; myelomalacia "with mild degenerative spinal stenosis and mild to moderate bilateral neural foramina stenosis"; "moderate to severe C3-C4 degenerative" stenosis with moderate bilateral neural foramina stenosis; mild C4-C5 degenerative stenosis with mild bilateral neural foramina stenosis; mild C6-C7 degenerative stenosis with moderate left neural foramina stenosis;

---

[15] Generally, evidence unsubmitted to the Commissioner below "cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). While I examine the new records, I do so only to determine whether the failure to develop the record prejudiced Plaintiff and not to decide whether these new records deprive the ALJ's decision of substantial evidence.

and "a moderate-sized right paracentral C7-T1 herniated nucleus with severe spinal stenosis. (*Id.*)

The second record is another cervical spine MRI from a month later. (R. 31, PageID.546-547.) The impression was:

> Solid-appearing fusion is seen involving the C4, C5 and C6 with degenerative spinal stenosis, patient is known to have myelomalacia posterior to C5 by prior MRI study of probably [*sic*] causing the patient's symptoms. Moderate degenerative spinal stenosis is seen at C3-C4, C4-C5, and C5-C6.
>
> Severe left C6-C7 neural foramina stenosis seen due to uncinate process hypertrophy.

(*Id.*) The third record covers Plaintiff's March 21, 2017 surgery, performed by Dr. Naman A. Salibi. (R. 31, PageID.554-557.) The procedure was listed as "C7 corpectomy, C6-T1 ACDF." (R. 31, PageID.554.) The pre- and post-operation diagnoses were "[i]nfra-segmental cervical spondylosis with severe left C6-C7 foraminal bony stenosis and central canal and bilateral foraminal stenosis at C7-T1. The patient presented with intractable neck pain and radiculopathy." (*Id.*)

Defendant argues that these materials contain no mention of functional limitations and are too technical to be useful for the ALJ. This is true, to an extent. Numerous cases warn ALJs against interpreting raw medical data, which they are not equipped to understand as lay persons. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) ("[A]n ALJ should resist the temptation to substitute the ALJ's own interpretation of medical records for that of a physician who has examined the records."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was

simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Carolyn A. Kubitschek & Jon C. Dubin, *Soc. Sec. Disability Law & Proc. In Fed. Cts.*, § 6:24 (April 2018) ("One error which ALJs frequently make is to reach their own medical conclusions about the evidence. ALJs, as lay people, are not permitted to substitute their own opinions for opinions of physicians."). Accordingly, some cases hold that ALJs may not employ the medical data in the RFC without guidance from a medical opinion. *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 828 (E.D. Mich. 2017) (collecting cases).

The gist of Defendant's argument, then, is that remand is futile because the ALJ could not meaningfully interpret the new reports. The present question, however, is not whether the ALJ could use these specific reports, but rather whether the reports suggest a *remand* (which could lead to the introduction of other records as well) could meaningfully affect the outcome. I believe it would. Even though the new records are largely beyond a lay person's ken, they make some things very clear. One is that Plaintiff has mild to severe degeneration up and down his spine. (R. 31, PageID.545-547.) Another is that medical experts believed these conditions justified surgery. Yet another is that, given Plaintiff's testimony linking his accident to this surgery, it appears likely that the procedure resulted from events chronicled in the record. And those events—the accident—also necessitated a procedure sealing Plaintiff's fractured vertebra. (R. 19, PageID.387-388.) These factors suggest that the imaging studies and surgery could change the picture of Plaintiff's capabilities.

On remand, this changed picture could come into clearer view with the production of new evidence. The regulations provide for additional evidence to be taken on remand when the Appeal Council sends the case to an ALJ. 20 C.F.R. § 416.1483; *see also* 20 C.F.R. § 416.1477. Plaintiff, now represented, likely could offer more evidence, perhaps including medical opinions on his functional limitations. And it would be strange if the medical providers ordered surgery without documenting their actions except in the surgery report.

Flaws in the ALJ's decision give other reasons for concluding that new evidence could shift the outcome. One is the ALJ's haphazard and incomplete analysis of Plaintiff's seizures, as explained above. Another, connected with the ALJ's insufficient performance at the hearing, was the decision's failure to address the surgery. At the hearing, the ALJ stated he would "just use your testimony that you have two surgeries." (R. 28, PageID.502.) In the decision, by contrast, he did not acknowledge the surgeries, instead characterizing Plaintiff's treatment regimen as "relatively static and conservative." (R. 19, PageID.60.) Not only does this ignore the surgeries, which the ALJ said he would consider, but it also fails to ask why the treatments were conservative—it may be that Plaintiff could not afford more aggressive treatment, but the ALJ did not probe this possibility despite the ruling (discussed above) requiring him to consider it. SSR 97-6p, 1996 WL 374186, at *7. Also mentioned above was the ALJ's insufficient questioning of Plaintiff's cognitive limitations. The ALJ disregarded Dr. Menendes's opinion that Plaintiff could not concentrate for a full workday because it was inconsistent with mental status examinations.

40

(R. 19, PageID.60-61.) It is not at all apparent, however, that those examinations meaningfully measure Plaintiff's ability to concentrate for long periods.

For these reasons, I conclude that the ALJ's failure to develop the record led to evidentiary gaps and inadequate analysis. These flaws were relevant to the disability determination. *Cf. Brown*, 2013 WL 5785783, at *8. I therefore recommend remand.

### 2.    "Sentence Six" Remand

#### a.    Parties' Arguments

Plaintiff's second argument asks for alternative relief. (R. 31, PageID.543.) He contends that the evidence attached to his brief constitutes "new and material" evidence warranting remand under "sentence six" of 42 U.S.C.§ 405(g). (R. 31, PageID.541.) The new records, Plaintiff states, show various degenerative changes and other issues with his spine. (R. 31, PageID.542.) These records would be meaningful to the analysis, Plaintiff argues. The RFC assigns Plaintiff to the "medium" exertion work. The ALJ based this conclusion only on spinal examinations that produced normal results. (R. 31, PageID.542-543.) Had the ALJ known of the more recent records, and waited for the surgery reports, he could not have properly claimed that Plaintiff's treatment was conservative, Plaintiff adds. (R. 31, PageID.542-543.)[16]

Defendant notes that to obtain a "sentence six" remand, a plaintiff must show a reasonable probability of a different outcome on remand. (R. 32, PageID.569-570.)

---

[16] "Of course," Plaintiff continues, "the ALJ could not be aware that Plaintiff would actually undergo extensive cervical spine surgery barely a month after his decision[.]" (R. 31, PageID.543.) That is inaccurate. Plaintiff's testimony, as well as the ALJ's response, put the ALJ on notice about the surgery; if the ALJ remained unaware of the extensiveness of the procedure, it was because he failed to probe the matter.

Plaintiff here cannot do so, Defendant alleges, for reasons that mirror those in the first argument.

### b.    Analysis

Because I recommend remand based on Plaintiff's first contention, resolution of his alternative argument is unnecessary. However, to cover all bases, I will briefly address this issue.

In general, two types of remands are available under 42 U.S.C. § 405(g). See generally *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 725 n.3 (6th Cir. 2014). The statute states in relevant part,

> [Sentence Four:] The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. . . . [Sentence Six:] The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). Remand under "sentence six" is not appropriate unless the claimant shows: (1) "the evidence at issue is both 'new' and 'material,'" and (2) "there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). It is material only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the

42

disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). This Circuit's "harder line" approach to "good cause" requires the claimant to "demonstrate[] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357.

Here, the two MRI studies are not "new" because they pre-dated the hearing and decision. *See Baker*, No. 12-cv-14530, 2013 WL 6409955, at *15 ("Since all of the newly submitted records pre-date the ALJ's decision, they are not new.") The surgery report would be "new," as it neither existed before the decision nor was available to Plaintiff. For the reasons discussed above, the surgery report (along with other evidence surrounding the surgery that would be generated on remand) might reasonably lead to a different result, particularly given the decision's flaws. Finally, "good cause" exists because the report did not yet exist and the ALJ did not inform Plaintiff that the record could be held open to obtain the report (or more information about the surgery). *See* 20 C.F.R. § 416.944; *cf. Vaca*, 2010 WL 821656, at *10.

Thus, remand could be justified under "sentence six." I continue to recommend, however, remand under "sentence four." A "'sentence four' remand involves a substantive ruling by the court as to the correctness of the Commissioner's decision and a subsequent remand for further proceedings in light of that determination." *Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 434 n.1 (6th Cir. 2016). By contrast, a "sentence six" remand addresses cases in which new evidence has cropped up. See *Martinez v. Comm'r of Soc. Sec.*, No. 1:15-CV-605, 2016 WL 2907844, at *7 (W.D. Mich. May 19, 2016). The root

problem here is the ALJ's failure to develop the record and the resultant flaws in his decision. That failure represents a defect in the proceedings that should be addressed pursuant to "sentence four." *See Malecki v. Comm'r of Soc. Sec.*, No. 3:12CV1658, 2013 WL 3776738, at *6 (W.D. Mich. July 9, 2013) ("Finally, since the recommended resolution would 'direct [the ALJ] to cure some specific defect in the administrative proceeding, such as the ALJ's failure to develop the record or properly evaluate the evidence . . . the district court should [ ] remand[ ] the case pursuant to sentence four, rather than sentence six . . . .'" (citation omitted)).

## H.   Conclusion

For these reasons, I would conclude that substantial evidence does not support the Commissioner's denial of benefits and I recommend **GRANTING** Plaintiff's Motion, (Doc. 31), **DENYING** the Commissioner's Motion, (Doc. 32), and **REMANDING** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

# II.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 11, 2019                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 11, 2019                     By s/Kristen Castaneda
                                           Case Manager